[Cite as *In re A.H.*, 2011-Ohio-6446.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

---

JOURNAL ENTRY AND OPINION
Nos.   96826 and 96827

---

# IN RE:   A.H. AND M.W., JR.

# Minor Children

---

## JUDGMENT:
## AFFIRMED

---

Civil Appeals from the
Cuyahoga County Court of Common Pleas
Juvenile Division
Case Nos. AD 09902717 and AD 09902718

**BEFORE:**   Boyle, P.J., Jones, J., and E. Gallagher, J.

**RELEASED AND JOURNALIZED:**   December 15, 2011

**ATTORNEY FOR APPELLANT**

Joseph Vincent Pagano
Post Office Box 16869
Rocky River, Ohio   44116

**ATTORNEYS FOR APPELLEE, STATE OF OHIO**

William D. Mason
Cuyahoga County Prosecutor
BY:   Michelle A. Myers
Assistant County Prosecutor
Cuyahoga County Department of Children and Family Services
3955 Euclid Avenue, Room 313E
Cleveland, Ohio   44115

MARY J. BOYLE, P.J.:

{¶ 1}   Appellant-mother, S.H.[1] ("mother"), appeals the juvenile court's judgment granting permanent custody of her two minor children, A.H. (d.o.b. 2/26/00) and M.W. (d.o.b. 11/26/08), to Cuyahoga County Department of Children and Family Services ("CCDCFS" or "the agency").   She raises one assignment of error for our review:

{¶ 2}   "The trial court abused its discretion in awarding permanent custody to CCDCFS and finding it was in the children's best interest because the award is against

---

[1]The parties are referred to by their initials or title in accordance with this court's established policy regarding non-disclosure of identities in juvenile cases.

the manifest weight of the evidence and is not supported by clear and convincing evidence."

{¶ 3} Finding no merit to her appeal, we affirm.

Procedural History and Factual Background

{¶ 4} CCDCFS opened a case involving mother and A.H. in October 2008, when mother testified positive for PCP. Mother was pregnant with M.W. at that time; he was born a month later. At first, A.H. and M.W., after he was born, were placed under the protective supervision of CCDCFS, with mother retaining legal custody of them. But in June 2009, CCDCFS obtained temporary custody of the children. Except for a short time when they were first removed from mother's custody, they had been residing with the same non-relative foster family since late June 2009.

{¶ 5} In May 2010, CCDCFS filed a motion to modify temporary custody to permanent custody. In October 2010, mother filed a motion for legal custody to maternal grandmother, Zella Hall-Jackson ("maternal grandmother" or "grandmother").

{¶ 6} Thomas Kozel was originally appointed guardian ad litem for the children. In a report that he filed with the court in September 2010, Kozel recommended that the maternal grandmother receive legal custody of the children. He opined that grandmother's home was appropriate and that grandmother had a positive relationship with A.H. He further indicated that he believed CCDCFS's only concern regarding grandmother was that she would return the children to their mother once she got out of

prison. But Kozel stated that he disagreed with CCDCFS that grandmother would return the children to their mother.

{¶ 7} The record indicates, without explanation, that in December 2010, a new guardian ad litem, Carla Golubovic, was appointed for the children. In March 2011, Kozel was appointed as A.H.'s attorney.

{¶ 8} Golubovic submitted her report to the court in January 2011. She recommended to the court that it grant permanent custody to CCDCFS. She explained that A.H. has "very strong opinions as to her custody," and that "A.H.'s desire is to always be placed with her brother." Golubovic stated that A.H. wanted to be placed into the legal custody of her maternal grandmother and "hopes one day to be reunited with her mother." Golubovic noted, however, that A.H. was conflicted about her current placement because she acknowledged that her foster home is "comfortable and appropriate," and that her foster family "is very proactive in both her schooling and her spiritual life." But Golubovic further noted that A.H. "assumes a protective/defensive nature regarding the biological family."

{¶ 9} Golubovic recommended that the agency receive permanent custody because "the children are in need of a secure and stable home." Golubovic opined that although A.H. wanted to live with her maternal grandmother, it was not in A.H.'s best interest. Golubovic found grandmother's home was adequate, but had concerns about grandmother's income, as well as her health, and concluded that she did not believe

grandmother was "able to properly provide for the children until they reach the age of majority."

{¶ 10} The trial court held a hearing on CCDCFS's permanent custody motion in March 2011. Mother was incarcerated at the time of the hearing, but was present for it. Before the hearing began, mother stipulated to R.C. 2151.414(E), that the children could not be placed with her within a reasonable time, or should not be placed with her. Thus, the only issue before the trial court was whether it was in the children's best interest to be placed in the permanent custody of CCDCFS under R.C. 2151.414(D).

{¶ 11} Precious Reed testified that she was a social worker for CCDCFS assigned to the case of A.H. and M.W. She had been involved with the family since October 2009. Reed testified that when CCDCFS obtained temporary custody of the children, two relatives came forward to assume placement of the children, a maternal aunt, Zella Hall, and the maternal grandmother, Zella Hall-Jackson. The maternal aunt "never followed through with the agency," and the maternal grandmother was not approved for placement because of issues with the maternal grandfather, who was living in the home at that time, and because of the grandmother's "history with the agency." Grandmother had 12 children of her own, three of whom still lived with her — a 16-year-old son, a 17-year-old daughter, and an 18-year-old son who was in the 11th grade of high school. Although none of grandmother's children had been removed from her home, she had a "substantial history" with the agency, including "at least 13 referrals."

{¶ 12} In January 2010, maternal grandmother again came forward to be considered for placement. The agency conducted a second home study that took approximately five months — home studies are normally completed in one month. Reed testified that when investigating grandmother, there were many times when "mom was involved also," so the agency had concerns that grandmother would return the children back to their mother.

{¶ 13} Reed explained that there were issues with grandmother's income as well. Grandmother's only income came from one of her children's social security check. There was no known work history. There were also issues with grandmother's home with the cleanliness and bedding concerns.

{¶ 14} Further, Reed explained that there were other issues with grandmother having custody of the children. The agency had concerns about grandmother's health. Grandmother had surgery in November 2010, and often had doctor's appointments when Reed was trying to contact her. Reed stated that a Cleveland Municipal Court judge reported in a journal entry involving a curfew violation involving Reed's 16-year-old son that "the parent is quite ill and she's unable to monitor her [son] always." Reed said that grandmother never explained her health issues to Reed, except to say that she had a stroke eight years ago, and "that still sometimes it bothers her."

{¶ 15} Reed testified that the agency was also concerned about grandmother's ability to properly care for her grandchildren based on her history with her own children. In October 2010, grandmother had a "criminal warrant" for the curfew violation

involving her 16-year-old son which grandmother did not "clear up" until February 2011. Reed further testified that grandmother's children had a history of "30 delinquency charges dating back to 1993." In addition, grandmother's 17-year-old daughter was pregnant and had many "tardies, and some absences, and suspensions."

{¶ 16} Reed testified that A.H. was delayed in school when the agency gained custody of her. A.H. had been raised by maternal grandmother and mother over the years. A.H. was only in the third grade at 11 years old. Further, A.H. could not read when the agency gained custody of her, despite not having any learning disabilities. But Reed said that since A.H. had been in the agency's custody, her grades had improved, she made the merit roll, and she seemed excited about school and learning now.

{¶ 17} Grandmother had visitation with A.H. and M.W. in her home for two hours every Monday. Reed stated that the agency had concerns with the visitation regarding A.H. not doing her homework while she was there, the children not eating during the visit, and grandmother's interaction with the children. When Reed was present for one visit, she saw hamburger on the counter, and grandmother told her that she was going to make "chili cheese fries" for dinner. Reed explained that when A.H. visits her grandmother, "she runs and gets on the computer." Reed opined that the children do not receive "the attention that they need when they're there." And although Reed had not spoken to grandmother about A.H. not completing her homework during her Monday visitation, she had explained to grandmother the seriousness of A.H. being behind in

school, and the fact that A.H. would need continued tutoring and monitoring to "maintain what she's doing now currently in school."

{¶ 18} Reed testified that A.H. and M.W. have a strong sibling bond. "They have always been together. [A.H.] is very protective of her brother. They're loving, they're affectionate towards one another. [A.H.] pretty much makes sure he's taken care of." The children also have a close relationship with other children in the foster family's home, although A.H. had a "sibling rivalry" with her foster sister who is the same age.

{¶ 19} Reed admitted that A.H. is "very bonded to her grandmother," and very protective of her mother. Reed further admitted that A.H. will most likely continue to contact her biological family and have a relationship with her grandmother, even if the agency was awarded permanent custody. Reed stated that the foster family had "been willing to promote that relationship." The foster mother took A.H. to her grandmother's on an off-visitation day because grandmother had planned a birthday party for her.

{¶ 20} Although A.H. told Reed that she wanted to live with her grandmother, she also told Reed at one point that she "was fine with staying at the foster's home." The most recent conversation Reed had with A.H., A.H. told her "that whatever happens, she is going to be okay with it."

{¶ 21} Reed opined that she believed it was in A.H.'s best interest for the agency to receive permanent custody and not live with her maternal grandmother. She said it was in A.H.'s best interest because she needed stability and permanency in her life.

{¶ 22} Reed further opined that it was also in M.W.'s best interest for the agency to receive permanent custody. He had been in the agency's custody since he was six months old and was bonded with his foster family. M.W. was "on target, there [were] no developmental concerns, and [Reed] believed that he deserves a permanent, safe, and stable environment."

{¶ 23} Doris Stone, A.H's and M.W.'s foster mother, testified that in addition to A.H. and M.W., she and her husband had a ten-year-old adopted daughter and a 14-year-old foster child living with them. Her other children, three biological and three adopted, were all grown. She explained that when A.H. first came into her home at nine years old, she did not want to go to school, she did not know all of her alphabet letters, nor was she able to read simple words such as "the." Now, A.H. wants to go to school and is "proud" of her work.

{¶ 24} Stone testified that when A.H. visits her grandmother, she does not do her homework and she comes home hungry, saying she did not eat dinner at her grandmother's house.

{¶ 25} Stone testified that she was willing to adopt A.H. and M.W. if the agency were granted permanent custody. She said that A.H. calls her "mom," and A.H. tells her she loves her. Stone said that if she adopted A.H. and M.W., she would allow A.H. to continue to have contact with her biological family.

{¶ 26} Maternal grandmother testified that her 18-year-old son, who was in the 11th grade, "makes the merit roll every year." She said that her 17-year-old daughter

attends "Margaret Ireland for credit recovery," and was on the honor roll the previous year. Grandmother explained that her 17 year old had missed a lot of school this year because she was pregnant and gets morning sickness. Her youngest son was also doing okay in school, but not great.

{¶ 27} Grandmother testified that A.H. lived with her for four years when she was young because mother was not properly caring for her. During that time, grandmother registered A.H. in preschool and said that A.H. did well. Grandmother gave A.H. back to mother after four years, but said that she had not known that mother was on drugs. She testified that she would not have given A.H. back to mother if she had known, and she said that she would never give mother the children now that she knows. She also said that she would not let mother live with her when she got out of prison.

{¶ 28} Grandmother testified that she receives income from three of her children's social security checks because their father is disabled. She testified that she receives $279 for each child. Although the one child had turned 18, he was still receiving social security. Grandmother also testified that she lives in a six-bedroom house and that two of the bedrooms are not occupied. She testified that she cooks meals for her children and that she cooked for A.H. and M.W. when they visited. She further testified that if she gained custody of A.H. and M.W., she would make sure that A.H. continues to have a tutor for school.

{¶ 29} Grandmother explained that her 16-year-old son's curfew violation was dismissed. She denied having any medical issues and said that she never told the judge

that she was ill. But she did admit that she is paralyzed on one side of her body from the stroke. As for the 30 delinquencies that her children had in the past, grandmother explained that they got into drugs, were stealing, and quit going to school. Grandmother testified that she was the best mother she could be, but said her children had "minds of their own."

{¶ 30} On cross-examination, grandmother admitted that of her nine adult children, only three graduated from high school. She also admitted that over the years, she had "about 10 curfew violations." She further admitted that her children had 33 delinquencies over the years, but denied that it had anything to do with her parenting skills.

{¶ 31} Golubovic testified that grandmother told her that she only receives social security for one of her children. She also testified that she had concerns about the upstairs of grandmother's home because it was in "very poor condition." The crib that grandmother had for M.W. was very small, and he was two-and-a-half years old. The bed she had for A.H. consisted of "two old dirty mattresses."

{¶ 32} In her report, Golubovic based her recommendation of permanent custody on the fact that M.W. was bonded to his foster family, and did not have any bond with his biological family; maternal grandmother's home was "adequate," but her health was questionable; grandmother was not employed and did not have adequate verifiable income; maternal grandmother did not seem to know that her daughter was not adequately

providing for A.H.; and Golubovic did not believe that the maternal grandmother was able to provide for the children until they reach the age of majority.

{¶ 33} On cross-examination, Golubovic testified that A.H. wanted to live with her grandmother. She said that A.H. has self-esteem issues because she is below average academically, and her foster sister, who is the same age, is "high functioning, and she's popular, and she's cute," and "things don't come as easy to A.H."

{¶ 34} Golubovic opined that if the agency were granted permanent custody of A.H. and M.W., she believed that it would be in A.H.'s best interest to maintain a relationship with her biological family, but not for weekly visits. She explained that in order for A.H. to move forward, weekly contact would not be good.

{¶ 35} After considering all of the evidence, the trial court granted permanent custody of A.H. and M.W. to CCDCFS. The court explained that M.W. had no bond with his biological family since he had been in the agency's custody since he was six months old. The court stated that during its in-camera interview with A.H., it asked her how she would feel if she went and lived with her grandmother and M.W. stayed with their foster mother. The court said that A.H. "burst into tears." The court found, inter alia, that the "testimony established that these siblings must stay together." The court found that it placed less weight on A.H.'s wishes because she was too conflicted about where she wanted to live. The court expressed that it had concerns for grandmother's health, the fact that only three of her nine adult children had graduated from high school, and the significant juvenile delinquent history her children had over the years.

**{¶ 36}** Mother appealed the trial court's decision to grant permanent custody to CCDCFS. Mother claims the trial court's decision is against the manifest weight of the evidence and is not supported by clear and convincing evidence. She argues that it was in the children's best interest for maternal grandmother to receive custody of them.

<u>Permanent Custody Motion</u>

**{¶ 37}** Before a juvenile court may terminate parental rights and award to a proper moving agency permanent custody of a child, it must find clear and convincing evidence of both prongs of the permanent custody test that: (1) the child is abandoned, orphaned, had been in the temporary custody of the agency for at least 12 months of the prior 22 months, or that the child could not be placed with either parent within a reasonable time or should not be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D).

**{¶ 38}** "'Clear and convincing evidence is that measure or degree of proof which is more than a mere "preponderance of the evidence," but not to the extent of such certainty as is required "beyond a reasonable doubt" in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established. A determination of whether something has been proven by clear and convincing evidence will not be disturbed on appeal unless such determination is against the manifest weight of the evidence. If a burden of proof must be met with clear and convincing evidence, a reviewing court must examine the record and determine if the trier

of fact had sufficient evidence before it to satisfy that burden of proof.'" *In re M.H.*, 8th Dist. No. 80620, 2002-Ohio-2968, ¶22, quoting *In re E.M.* (Nov. 8, 2001), 8th Dist. No. 79249.

{¶ 39} Since mother stipulated that A.H. and M.W. could not be placed with her within a reasonable time, or should not be placed with her, this court must determine whether the trial court had sufficient evidence before it to clearly and convincingly find that it was in A.H.'s and M.W.'s best interest to place them in the permanent custody of CCDCFS.

<u>Best Interest Factors</u>

{¶ 40} When determining whether a grant of permanent custody is in the children's best interest, the juvenile court must consider the following factors:

{¶ 41} "(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

{¶ 42} "(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

{¶ 43} "(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;

**{¶ 44}** "(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency[.]"   R.C. 2151.414(D)(1)(a)-(d).

**{¶ 45}** This court has "consistently held that only one of the factors set forth in R.C. 2151.414(D) needs to be resolved in favor of the award of permanent custody in order for the court to terminate parental rights."   *In re Z.T.*, Cuyahoga App. No. 88009, 2007-Ohio-827, at ¶56.

**{¶ 46}** Here, we conclude that the trial court had sufficient competent credible evidence before it to find that it was in A.H.'s and M.W.'s best interest to be placed in permanent custody.   There is no question that the trial court's decision regarding M.W. was the easier one to make; he had been removed from his biological family since he was six months old, and was therefore more bonded to his foster family.   The more difficult decision was A.H.   She was 11 years old.   She had been raised by her mother and grandmother, and she clearly loved them.   Indeed, she was very protective of them.   The trial court considered that A.H. wanted to live with her grandmother, but found that the evidence established that she was also conflicted about where she wanted to live.

**{¶ 47}** Although it is certainly understandable that A.H. had a strong connection to her mother and her maternal grandmother, we cannot say the trial court erred by considering A.H.'s relationship to M.W. as well.   There was substantial evidence before the trial court that A.H. was very protective of her younger brother and got very upset at the thought of being separated from him.   As Reed explained, M.W. was the one constant

in A.H.'s life. Thus, although mother argues that the trial court should have granted legal custody to grandmother due to A.H.'s strong bond with her biological family, we cannot say the trial court abused its discretion in awarding CCDCFS permanent custody of A.H. and M.W.

{¶ 48} Mother argues that "CCDCFS did not adequately pursue placement of the children with their extended family." But the evidence does not support mother's contention. Further, in awarding permanent custody to the agency, the juvenile court did not have to find that permanent custody was the "only option" or that "no suitable relative was available for placement." *In re Schaeffer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶64.

Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


MARY J. BOYLE, PRESIDING JUDGE

LARRY A. JONES, J., and
EILEEN A. GALLAGHER, J., CONCUR